REID, Judge.
The facts and issues of this case are so well set forth by the Trial Judge that we take the liberty of quoting in full his oral reasons for judgment dictated into the record.
“This matter arose out of a contract between the plaintiff and the City of Baton Rouge for the salvage rights at the two City dumps located at the foot of McKinley Street and in the Devil’s Swamp area. The contract was filed in evidence as P-1. In the contract plaintiff contracted with the City of Baton Rouge, Parish of East Baton Rouge, Louisiana, for the sum of $1,576.00 for a two year contract for the salvage rights at the two above named City-Parish dumps.
“From the evidence apparently Mr. Lawrence acquired several trucks and a dragline machine and commenced to salvage primarily tin cans from the Devil’s Swamp garbage dump, the other dump being primarily a trash dump. From the evidence apparently Mr. Lawrence could gather the tin cans in the following manner : The garbage would be dumped each day of the week, except Sunday, and consisted of somewhere from twenty-six to thirty-five or forty garbage trucks per day. The garbage was then burned, tisually each night, after being delivered and then permitted to cool off. This apparently took about three days. Mr. Lawrence would then move his dragline through the burned area with an electromagnet attached to the boom and would pick up these tin cans and deposit them in his dump trucks. They would then be taken to a local scrap material plant where it was shipped to a firm in Houston.
“Shortly after he commenced operating In this manner he received word from the Houston buyer that the cans contained too much residue and would have to be processed before shipment. Either after a meeting or about the time of a meeting between the Director of Public Works, Mr. A. M. Rosenthal, Jr., and a City-Parish councilman, plaintiff was permitted to place a can plant, which consisted of a huge cylinder, near the center of the dump. The cans were then dumped into this cylinder and the residue in the cans would be thrown out. The cans were then loaded from the cylinder into the dump trucks. This, of course, involved a totally new method of operating, since the burned garbage had to be moved near the vicinity of the can plant where it could be picked up by the electromagnet. After all cans were removed from the burned garbage, the residue was pushed by a bulldozer into a ravine.
“Plaintiff operated in this manner for a while and then commenced to have trouble due to complaints by certain parties that the City-Parish bulldozer was being used for the sole benefit of this plaintiff. Mr. Lawrence also testified he was having some difficulty with a Mr. Benny Mumphrey, who operated the City-Parish bulldozer. He stated Mr. Mumphrey would not cooperate with him without being paid for doing so. He reported this to Mr. Rosenthal, who asked that the plaintiff sign a written statement to that effect, at which time the City would investigate the complaint and, if true, would take action to discharge Mr. Mumphrey. Plaintiff refused to sign such a statement and Mr. Mumphrey continued to operate the bulldozer at the Devil’s Swamp dump.
“On April 24, 1964, plaintiff wrote a letter to Mr. Rosenthal, which letter is filed as City-1, in which letter plaintiff complains of the problem of having to move or handle the material, namely, the cans, twice; that is, from the burned out area to the plant site and then the residue from the plant site to the ravine. He stated in the letter that this was making the operation nonprofitable. He offered in the letter to lease the bulldozer being used by the City-Parish and in return for use of the machine, would perform necessary work in the garbage area for the benefit *321 of the City-Parish and for his own Benefit in moving cans to the plant site.. On April 30, 1964, in a letter marked City-2, Mr. Rosenthal answered the plaintiff’s letter informing him that the Parish Attorney had advised that the City-Parish could not legally lease any of its equipment. However, Mr. Rosenthal offered to permit plaintiff to take over the complete operation of the disposal area with plaintiff’s equipment. Apparently, Mr. Lawrence did not desire to do so.
“The only issue, as the Court views the matter, is whether or not the City-Parish Government was obligated under this lease to use the bulldozer in such a manner as to make the salvage operation profitable for the plaintiff. This would entail moving the burned garbage to the vicinity of the can plant, moving the trash around to permit the plaintiff to salvage the cans from the burned garbage, and then moving the residue away from the can plant to permit other burned garbage to be moved in the area. The Court is of the opinion that this was not contemplated in the lease and that plaintiff under the lease, and in view of letter written by Mr. Rosenthal on April 30th, above referred to, could have brought his own bulldozer into the area in order to facilitate the salvage operation. This he failed to do for reasons best known to plaintiff. Whether or not Mr. Mum-phrey was taking payments from the plaintiff for the use of this bulldozer is not material in the Court’s opinion, in view of the fact that Mr. Mumphrey would have had no authority to use the bulldozer in such a manner with or without consent of the Parish. For that reason, the Court is going to deny plaintiff’s claim and dismiss plaintiff’s suit at plaintiff’s cost. Judgment will be signen accordingly.”
These reasons were rendered on May 10, 1965, and judgment was signed on May 18, 1965, from which judgment the plaintiff has appealed.
The letter of April 24, 1964, from Falcon Salvage & Trucking Co., Inc. to Mr. A. M. Rosenthal, referred to in the foregoing reasons for judgment and which was filed in evidence as “City-1,” reads as follows;
“Dear Mr. Rosenthal:
As you know I have built and installed a processing plant on the garbage area at Devils Swamp. This was done in or.der to make the tin cans marketable. With the plant in operation I have been confronted with another problem;' that is having to move or handle the material (cans) twice, from burned out area to plant site. This has cut production in half and is making the operation entirely non-profitable. I would like to make the following proposal to you.
“I would like to lease the small bull dozer being used by the City Parish Refuse Department in the garbage area at present. This machine is being used now by your Department to level out burned debris and cans and to provide new dump areas for incoming garbage. I would like to lease the machine and in payment of said lease perform necessary work in garbage area as described above plus, for my own benefit in moving cans to plant site. This would eleminate one operator for the City and would greatly help my operation.
“This has been discussed with Mr. Cecil DeArmond and was fully sanctioned and approved by him. If any more details are needed I suggest that Mr. DeArmond and I meet-with you at your convenience.”
Mr. A. M. Rosenthal, Jr.’s answer to that letter, dated April 30, 1964, also referred to in the Trial Judge’s reasons for judgment and which was filed in evidence as “City-2,” is as follows:
“Dear Mr. Lawrence.
“In answer to your letter of April 24th, I have had a ruling from Mr. R. Gordon Kean, the Parish Attorney, advising me that he would have no objection to your *322 taking over the complete operation of the Devil’s Swamp refuse disposal area. He does now, however, believe that it is legally permissible to lease any of our equipment for this purpose.
“If you desire to do this type of work, that is, take over the complete operation of the disposal area, with your own equipment, it may be that something could be worked out.”
Plaintiff alleges two specifications of error, which we quote:
“I.
“The Trial Judge committed error in singling out the issue of whether the City-Parish was obligated to use its bulldozer in order that the plaintiff might operate a profitable business when, under the circumstances, the issue was to determine whether the City of Baton Rouge, Louisiana, had fulfilled its obligation as a lessor to maintain the lessee in peaceable possession of the thing leased and not to cause an interruption in the use thereof.
“II.
“That the City of Baton Rouge, Louisiana, having contracted for this agreement to be governed as a lease under the laws of Louisiana was obligated as a lessor to do what was reasonable and necessary to protect the lessee’s interest and to give reasonable notice of any changes in operation, particularly when the lessee was operating under an agreement which was beneficial to all and certainly not detrimental to the City of Baton Rouge, Louisiana.”
The basis of the plaintiff’s case is his contention that the City had failed to live up to its contract or lease agreement, alleging that under the contract and lease, including the specifications and advertisement for bids, all of which were made part of the contract and lease, the City of Baton Rouge contracted to fully cooperate with plaintiff or his representatives to the extent that the plaintiff would have the exclusive salvage rights. Plaintiff also says the City of Baton Rouge maintained control over the areas but invested the plaintiff with full authority to install and operate any equipment which would facilitate his operations provided the equipment did not interfere with the orderly operation of the respective dumps. Under the contract the Director of the Department of Public Works had the sole right to interpret the provisions of the contract for both parties.
The provisions of the lease upon which plaintiff relies are set forth under the specifications made a part of the lease and read thus:
“SUPERVISION AND PROTECTION: In enforcing the salvage privilege, the Contractor will keep on the site a competent superintendent or foreman as his representative and instructions given or notices served on this representative shall be binding on the contractor. City personnel working at the dump will cooperate with the contractor’s representative in enforcing the contractor’s exclusive rights to salvage. Police protection by the City will not be provided as a regular daily function. The contractor shall provide any watchmen necessary to protect his property and the interest of all parties concerned in this agreement.”
The plaintiff contends that in keeping with this agreement the Director of Public Works instructed a Mr. DeArmond, the Supervisor of the Refuse Division, to fully cooperate with plaintiff and his representatives.
The record is clear that following a meeting between plaintiff, Mr. A. M. Rosenthal, Mr. DeArmond, and Mr. A. R. “Cotton” Harris, a City Councilman, the method of operation was changed. As a result of this change the bulldozer operator working for the City had to perform additional services for the plaintiff because he would push the burned garbage to the vicinity of the can plant and after the cans were removed by an electromagnet the remainder of the *323 refuse was pushed by the bulldozer into a ravine. This made two operations on the part of the City’s operator.
Complaints were made to the City that the City’s equipment and personnel were operating for the benefit of a private individual. After receiving these complaints Mr. Ray W. Burgess, who had succeeded Mr. Rosen-thal as Director of Public Works, instructed Mr. DeArmond not to permit any City equipment or personnel to be used at the dump in any manner that could be construed as working for the plaintiff.
Mr. DeArmond testified that in accordance with these instructions he instructed Mr. Mumphrey, the bulldozer operator, to discontinue any work that could be construed to mean the City was working directly for the plaintiff’s salvage company. He further instructed Mr. Mumphrey to push the salvageable material up to Mr. Lawrence’s equipment and leave it there, he was not to turn it over in order to keep it burning nor to push the outer edges of the material in to the equipment nor to remove the residue. As a result of this change in procedure and the instructions given by the City officials, it became necessary for the plaintiff to obtain a bulldozer, which he would not do. Pie attempted to enter into a lease agreement with the City for the use of the bulldozer, which the City refused to do on advice of counsel. The City did offer to turn over the complete operation of the disposal area to the plaintiff but plaintiff for reasons of his own refused to do this. Nor was he willing to purchase or lease from a private source a bulldozer for his own use.
The lease in question is clear that the contractor had the right to install and operate any equipment he desired. The agreement also provided that he was to provide his own employees. All the plaintiff had under the contract was the exclusive right to collect and dispose of all salvageable materials found at the dumps. It is true the City’s personnel working at the dumps were to cooperate with the contractor’s representatives in enforcing the contractor’s exclusive right to salvage. Nowhere in the contract is there a provision that the City’s employees were to perform any services whatsoever for the benefit of the contractor in the performance of his operations. While it is true there is some evidence in the record that some of the City’s employees were not cooperative, there is no evidence in the record indicating that the City’s employees in any manner prevented the contractor from performing his services. He could have brought a bulldozer of his own upon the premises, and this Court is not impressed with his stated reason for not doing so, that is, that this would not help the situation because his man would be operating one way and the City’s employee another. There is absolutely no evidence that the City in any manner barred the plaintiff from the two areas.
We cannot agree with the plaintiff’s contention that because this was a lease agreement there was an implied obligation of the City to do the plaintiff’s work, which in effect is what the plaintiff is contending, regardless of how he states it. When the plaintiff entered into the agreement he intended to do his work a certain way but because of the loss of a contract due to excess residue in the cans the procedure of operation needed to be changed, which change made his business unprofitable, and in effect he attempted to have the City make his operations profitable.
This entire matter arose out of the fact that plaintiff had to make a change in his method of operation after he had entered into his agreement with the City in order to try to make the best out of a bad deal. Certainly the City of Baton Rouge should not have to pick up the tab for this.
For the above and foregoing reasons, the judgment of the Trial Court is affirmed.
Affirmed.